# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| United States, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: 14 CR 50067-2 |
| | ) | |
| Talib O. Bazzelle, | ) | |
| | ) | |
| Defendant. | ) | Judge Frederick J. Kapala |

## ORDER

Talib Bazzelle's motion to quash arrest and to suppress statements [33] and his motion to suppress physical evidence [34] are denied. This case is set for status hearing on October 2, 2015 at 9 a.m.

## STATEMENT

Defendant, Talib O. Bazzelle, is charged with conspiring with his brother, Tierre Bazzelle, to possess cocaine and cocaine base with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) & 846. Before the court are defendant's motion to quash arrest and to suppress statements and his motion to suppress physical evidence. For the reasons that follow, the motions are denied.

### I. FINDINGS OF FACT

In his motion to quash arrest and to suppress statements, defendant maintained that officers unlawfully stopped the vehicle in which he and Tierre were traveling and arrested him without probable cause in violation of the Fourth Amendment.[1] Defendant further maintained that the written and oral statements that he subsequently gave at the police station were taken in violation of his Fourth, Fifth, and Sixth Amendment rights because (1) Deputy Daniel Freedlund and Federal Bureau of Investigation ("FBI") Special Agent Adam King told him that he could not go home until he gave a written statement and that if he did not cooperate he would never see his wife again, but instead would be taken into federal custody "until this case is all over;" (2) Tierre was brought in as part of the coercive effort to make him give a written statement; (3) he signed a statement after only scanning it, and not completely reading it, just so that he could go home to his wife and children; and (4) he did not understand his Miranda warnings and did not even remember the warnings being read to him. In his motion to suppress physical evidence, defendant maintained that his consent to a search of his cell phone "was involuntary, unconstitutional and thus a direct or indirect consequence of his illegal arrest and his involuntary statement."

---

[1]Each motion is accompanied by defendant's sworn statement that the facts contained in the motion are true and correct to the best of his knowledge and belief.

At the evidentiary hearing on defendant's motions, Agent King testified that during a narcotics trafficking investigation a cooperating individual ("CI") made three controlled purchases of cocaine from Tierre. Based on this and other information, Agent King obtained a court order allowing the interception of calls and text messages to and from Tierre's cell phone. Intercepted phone conversations revealed that Tierre was obtaining cocaine from Ariel "Big Nose" Perez. Agent King described a March 22, 2014 telephone conversation between Tierre and defendant in which defendant spoke of providing Tierre with money he had obtained from selling cocaine. The CI also told Agent King that defendant was recently released from prison and was heavily involved with his brother in drug trafficking. Officers observed defendant in a hand-to-hand cocaine transaction on March 30, 2014, which was set up by Tierre.

On May 5, 2014, agents intercepted a conversation between defendant and Tierre in which defendant asked Tierre, "Big Nose ain't call you?" Tierre responded, "He texted. They won't be in till probably uh after 4 or 5." To which defendant said, "All right, but he definitely said it's official today." Tierre replied, "Yeah, his number he had changed his phone number too." Defendant then said, "Ok, cuz I got I got a lot of mother fuckin people waiting." Tierre said, "Yeah, said it's dry out here, ain't nothing out here. I been hearin it all, since I got off." Defendant responded, "Yeah, that's cool then, that means we just make more money." Agent King explained that, based on his training and experience in working narcotics investigations utilizing intercepted conversations, Tierre was letting defendant know that his supplier, Ariel Perez, had confirmed that he had cocaine to sell to Tierre and that defendant indicated that he needed cocaine because he had a lot of customers waiting. Tierre went on to say that the cocaine was scarce and defendant responded that the low supply would allow them to charge their customers more money for the cocaine.

The transaction which defendant and Tierre discussed did not occur on May 5, 2014. However, on the next day, May 6, 2014, at approximately 5:24 p.m., agents intercepted conversations between Tierre and Perez arranging for the purchase of 7.5 ounces of cocaine. Subsequently, agents observed Tierre, who was driving a green pickup truck with defendant as his passenger, rendevous with Perez's Cadillac in the parking lot of a grocery store. Tierre got out of the pickup and into the Cadillac while defendant moved into the driver's seat of the pickup. The Cadillac pulled away and defendant followed in the pickup. After a short time the vehicles stopped, Tierre got out of the Cadillac and into the passenger's seat of the pickup before both vehicles pulled away. Agent King was aware that defendant's driver's license was suspended. Next, defendant stopped the pickup and switched seats with Tierre so that Tierre was again driving the pickup. At approximately 7:10 p.m., at Agent King's direction, officers conducted a traffic stop of the pickup, took Tierre and defendant into custody, and recovered 7.5 ounces of cocaine from Tierre's person. Defendant and Tierre were immediately transported to the Winnebago County Sheriff's Department and placed in separate interview rooms.

At approximately 10 p.m., after first interviewing Tierre, Agent King and Deputy Freedlund entered the interview room where the unhandcuffed defendant was sitting. After introducing themselves, they made sure that defendant could speak English and learned that he had finished the eleventh grade, could read and write, and was not under the influence of drugs or alcohol. Deputy Freedlund then provided defendant with an advice of rights form containing the Miranda warnings.

2

Defendant read the first line of the form out loud at Deputy Freelund's request. Deputy Freedlund then read the remainder of the form, defendant indicated that he understood his rights and initialed each line. At 10:10 p.m., defendant signed the form at the bottom and Deputy Freedlund and Agent King signed as witnesses. Agent King presented defendant with another form providing consent to a search of defendant's cell phone. Agent King explained to defendant that they were trying to garner his cooperation and that if he consented to the search of his phone and decided that he wanted to cooperate, there was a chance that he was going to leave at the end of the conversation and that he would be able to take his phone with him after it was searched. Agent King explained further, however, that if defendant did not cooperate he would have to keep it and attempt to obtain a warrant to search the phone. Agent King specifically advised defendant that he had a right to refuse to sign the consent form. Defendant signed the form giving his consent to a search of his phone and also provided the information needed to unlock the phone.

When Agent King started to explain the investigation, defendant asked if he could speak to his brother. Agent King and Deputy Freedlund escorted defendant to the interview room where Tierre was and allowed them to speak in the agents' presence. Tierre told defendant that the agents had been on the phones, that they knew everything, and that defendant should just cooperate. Defendant agreed to cooperate, and went back to the original interview room where he answered questions inculpating himself in a conspiracy to distribute cocaine with Tierre. At 10:46 p.m., Deputy Freedlund began typing a statement based on what defendant told them and gave it to defendant. Defendant read the statement, initialed the beginning and end of each paragraph, initialed the end of the statement indicating that it was true and correct, and then signed and dated it at the bottom at 11:17 p.m. Thereafter, defendant and Tierre were allowed to leave based on their agreement to cooperate in the investigation. Agent King told defendant that he needed to stay out of trouble of any kind and to not talk about his arrest so that the on-going investigation would not be compromised.

When asked what he told defendant regarding his cooperation, Agent King said:

I told Talib that even if he cooperated on that day -- and basically all I needed Talib to do was not discuss anything that had happened on that day, but that he would be allowed to leave. If we felt he was being truthful, he would be allowed to leave at the end of our conversation that day and to go home, but that he would be charged eventually on a federal charge.

. . . .

If he did not agree to cooperate at that time, we were going to hold him, do a federal complaint in the morning, and then have him transferred over to the U.S. Marshals for an initial appearance.

Agent King denied telling defendant that if he did not cooperate that he would have to stay in federal custody until his case was over.

Defendant testified that he was paroled from Vienna Correctional Center on January 13, 2014, and married Tasha L. Simmons on January 16, 2014. At that time, defendant already had two sons with Simmons. Defendant testified that he has suffered from panic attacks and anxiety disorder

3

his whole life as a result of having been molested as a child and had been prescribed medication for the disorder in the past. Defendant said that he was a passenger in his brother's pickup truck on May 6, 2014, when deputy sheriffs "boxed them in" at a light and took them into custody. Before he was brought to the Sheriff's Department, defendant saw a deputy remove a Crown Royal bag from his brother's pants and say "we got it." At the Sheriff's Department, he and his brother were placed in separate interview rooms. After approximately an hour and ten minutes, Deputy Freedlund and Agent King came into the room and introduced themselves. Defendant knew the matter was serious when he learned that Agent King was with the FBI because he had previously only dealt with state and local law enforcement, but the FBI was "a whole different ball game." Defendant told them that he did not have anything to do with it and asked to speak with his brother. Tierre told defendant that the agents knew everything, "we gone bro." Defendant said the agents wanted Tierre to help them get Perez but they also said that they were going to get him anyway so it was best if they just cooperated and helped themselves. Defendant said that he was concerned about going back to prison as he had just gotten out, was recently married, had a job, had his kids, and now "it was like the rug was pulled from under [his] feet again." Defendant just wanted to leave. According to defendant, they told him he needed to give a statement and then all he needed to do to cooperate was refrain from criminal activity and not talk to anyone about the investigation. On the other hand, they needed Tierre to call Perez. When defendant asked what would happen if he chose not to incriminate himself by giving a statement, they told him he would be taken into federal custody until the investigation was over. Defendant admitted that he signed the forms advising of his Miranda rights and giving consent to a search of his phone, but claimed that he only signed them so that he would be permitted to leave. Contrary to assertions he made in his motion to suppress statements and to quash arrest, defendant testified that he understood all the Miranda rights and that he was waiving when he signed the form. Defendant also admitted that he signed and initialed the statement that Deputy Freelund typed, but claimed that he did not read it thoroughly.

On cross-examination, defendant agreed that neither Deputy Freedlund nor Agent King forced him to sign the Miranda rights form or threatened him. When asked how many times he has been advised of his Miranda rights during his life, defendant said "[a] lot in my time. Yes, a lot." Contrary to assertions he made in his motion to suppress statements and to quash arrest, defendant agreed that it was his idea, not the officers', to speak with his brother before making a statement. Defendant also admitted that he drove the pickup after Tierre got into Perez's Cadillac and that his driver's license was suspended at the time, but claimed that he did not know why Tierre was meeting with Perez that day. Defendant did concede, however, that on the day before they were arrested when he told Tierre that he had a lot of people waiting, he meant his cocaine customers.

## II. ANALYSIS

In its post-hearing brief, the government maintains that this court should deny defendant's motions arguing that defendant has abandoned his contention that agents lacked probable cause to stop and arrest him and, in any event, the agents had sufficient probable cause. The government argues further that defendant's custodial statements and his consent to a search of his cell phone were voluntary, not the product or threats or coercion, and followed a knowing and voluntary waiver of his Miranda rights.

4

Defendant posits three main arguments quoted verbatim below. The court will address each in turn as it considers whether the government has satisfied its burden.

### Defendant's First Argument:

**In the case at hand, Talib Bazzelle, who was suffering from a likely panic and anxiety attack upon his arrest, was told the only way that he could go home to his family if if [sic] he cooperated and gave a statement incriminating himself. Failing to confess would result in a quick trip to jail and then Federal custody pending the conclusion of the investigation against Ariel Perez and other unnamed persons. Such a promise by FBI Special Agent King and Winnebago County Deputy Sheriff Freedlund overcame Talib's will and resulted both in a Statement (following a <u>Miranda</u> Waiver) and a Consent to Search Talib's cellular telephone. Thus the Statement and Consent to Search must be quashed and the evidence resulting from the same excluded.**

(Dkt. No. 42, Def.'s Br. at 13-14.)

Due process requires that confessions be voluntary. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 225-26 (1973) (explaining that voluntary confessions may be used against defendants while the use of involuntary confessions offends due process). The government bears the burden of proving the voluntariness of a defendant's statement by a preponderance of the evidence. <u>United States v. Sturdivant</u>, 796 F.3d 690, 695 (7th Cir. 2015). "[A] confession is voluntary if, in the totality of circumstances, it is the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." <u>Id.</u> (quotation marks omitted). In determining whether there was coercion, courts consider: "the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." <u>Id.</u> (quotation marks omitted).

Similarly, the government bears the burden of proving that consent to search was freely and voluntarily given by a preponderance of the evidence; or, in other words, that it was more likely than not that consent was voluntary. <u>United States v. Grap</u>, 403 F.3d 439, 443 (7th Cir. 2005). Voluntariness is measured by whether a reasonable observer would determine that the consenting person acted voluntarily. <u>Id.</u> at 444. Because the burden is on the government to establish the voluntariness of both the statement and the consent, the court will consider them together.

Defendant's age of 32 is far from an age that would be unusually susceptible to suggestion or pressure during questioning by the police. <u>See, e.g.</u>, <u>A.M. v. Butler</u>, 360 F.3d 787, 800-01 (7th Cir. 2004) (holding that an 11-year-old's confession was involuntary where he had no prior experience with the criminal justice system; he was questioned for 2 hours with no parent, guardian, lawyer, or anyone at his side; and the detective continually challenged his statement and accused him of lying). As for his education and intelligence level, defendant made it through the eleventh grade and is able to read and write. In addition, defendant was gainfully employed at the time he was arrested. Consequently, the court finds nothing about defendant's age, education, or intelligence

level to indicate that he has any diminished mental capacity making him particularly vulnerable to coercion or incapable of resisting pressure.

With regard to his mental state at the time he decided to give a statement, without elaboration, defendant is arguing that he had a panic attack which overcame his free will due to the life-long anxiety he suffers as a result of having been molested as a child. The court seriously questions the veracity of defendant's claimed mental distress considering that he did not inform King and Freedlund of his condition or explain when, if ever, he had been diagnosed with any mental disorder. Morever, while he claimed to have been prescribed medication in the past, he did not provide any evidence of a history of medication being prescribed and, in any event, he was not taking medication at the time of the interview. But even assuming the veracity of defendant's testimony, to the extent that defendant was experiencing a panic attack it was not outwardly apparent to Agent King who testified that he did not recall that defendant manifested any signs of nervousness. After having had the opportunity to observe the manner and demeanor of Agent King while listening to him testify at length at the evidentiary hearing, the court credits his testimony. See United States v. Schwensow, 151 F.3d 650, 660 (7th Cir. 1998) (rejecting contention that defendant's impaired mental state during interview precluded a valid waiver of his Miranda rights where the district court heard officers' believable testimony that defendant gave no indication of being impaired).

The length of defendant's detention was not particularly unreasonable considering defendant was arrested at 7:10 p.m., his interview, after finishing with Tierre, began at approximately 10 p.m., defendant signed the Miranda rights form at 10:10 p.m., Deputy Freedlund began typing defendant's statement at 10:46 p.m., and defendant signed his statement at 11:17 p.m. just before he was released. This time table establishes that defendant made his choice to cooperate relatively quickly after conferring with his brother and then he spoke with Deputy Fredlund and Agent King for a little more than a half hour, from 10:10 p.m. until 10:46 p.m. This is clearly not a case where law enforcement agents held a suspect for an extended period of time in an effort to persuade him to provide a statement against his will.

The nature of the interrogation in this case was not coercive. Agent King and Deputy Freedlund did not start talking to defendant until about 10:00 p.m., allowed him to confer with his brother before deciding whether he wanted to cooperate, and defendant had given his statement orally by 10:46 p.m. when Deputy Freedlund began typing what defendant had related. Defendant argues that the promises Agent King made to him overcame his will. However, it is now undisputed that defendant was told that he was going to be charged federally no matter what, but that he had two options: (1) cooperate by giving a truthful statement, refraining from any further criminal activity, and not speaking of his arrest and he would be released from custody and permitted to remain at large until the investigation was completed, or (2) decline to cooperate, remain in custody over night, and be charged in federal court the next morning. Defendant is apparently arguing that these "promises" rendered his statement and consent to search involuntary but he does not explain why or support his argument with applicable authority. Defendant's attempt to support his argument with authority appears on page 10 of his post-hearing brief:

> Improper promises of benefits sufficient to render a statement involuntary can include both leniency by the prosecution or any other benefit to the defendant.

6

> **NEED CITATION.** Any other benefit includes a promise to be released from custody of the law enforcement agencies. **NEED CITATION.**

(Dkt. No. 42, Def.'s Br. at 10.) This argument is waived because it is not supported by analysis and citation to pertinent authority. See United States v. Wescott, 576 F.3d 347, 356 (7th Cir. 2009) (stating that unsupported and undeveloped arguments are waived); see also United States v. Holm, 326 F.3d 872, 877 (7th Cir. 2003) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." (quotation marks omitted)).

Waiver aside, defendant's argument fails. Defendant was unable to locate supporting citations for his argument because it is contrary to the law. Police officers who inform an arrestee of the charges that they intend to bring, and for which they have probable cause to believe the arrestee has committed, do not offer an illegal inducement or unlawfully coerce a confession. See United States v. Murdock, 491 F.3d 694, 699-700 (7th Cir. 2007); see also United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th Cir. 1992) (holding that an officer "who informs the defendant of realistically expected penalties for cooperation and/or non-cooperation does not offer an illegal inducement"). Moreover, officers are not "prohibited from inducing a confession with an honest promise of leniency." Sprosty v. Buchler, 79 F.3d 635, 646 (7th Cir. 1996); United States v. Harris, 914 F.2d 927, 933 (7th Cir.1990) ("[P]olice are free to solicit confessions by offering to reduce the charges against the defendant."). While false promises of leniency may render a statement involuntary, United States v. Villalpando, 588 F.3d 1124, 1128 (7th Cir. 2009), "[the] Government is not forbidden to 'buy' information with honest promises of consideration," United States v. Rutledge, 900 F.2d 1127, 1130 (7th Cir. 1990).

In this case, Agent King made no false promises. Instead, he made it clear to defendant that he was going to be charged in federal court at some point in the future and offered defendant an opportunity to delay the charges against him and to stay at large if he agreed to cooperate. After conferring with his brother, defendant exercised his free will and agreed to cooperate. This type of consideration is not coercive or capable of overwhelming a suspect's will. See United States v. Dunkelberger, No. CR. 10–40064–01–KES, 2010 WL 4868187, at *6 (D.S.D. Nov. 23, 2010) (finding in a case where a detective told defendant that she should sign an inculpatory statement so that they could all go home to supper was "not sufficient to overpower the will of a person who is accused . . . and facing a possible felony conviction."); see also Commonwealth v. Templin, 795 A.2d 959, 967 (Pa. 2002) (holding that defendant's confession was voluntary despite a promise to recommend pre-trial release on own recognizance if he were to admit his actions). In this case, the evidence shows that Agent King was completely up front and honest with defendant as to what was going to transpire and gave him the choice of cooperating or not cooperating. Defendant made his choice and while he may regret it now, posing that choice then was not coercive.

The remaining factors do not suggest an involuntary confession or consent either. Significantly, it is undisputed that defendant was advised of his Miranda rights and understood those rights prior to agreeing to give a statement and to consent to a search of his cell phone. See R. LaFave, et al., 2 Crim. Proc. § 6.2(c), at 460 ("The fact that warnings were given is an important factor tending in the direction of a voluntariness finding. This fact is important in two respects. It bears on the coerciveness of the circumstances, for it reveals that the police were aware of the suspect's rights and presumably prepared to honor them. And . . . . it bears upon the defendant's

susceptibility, for it shows that the defendant was aware that he had a right not to talk to the police."). In addition, there was no physical force utilized against defendant and no indication that he was hungry or suffered from sleep deprivation.

Having utilized the multi-factor test laid out by the Seventh Circuit, the court finds no evidence of coercion capable of overwhelming defendant's will and making his statement or consent involuntary. See Rutledge, 900 F.2d at 1129. Therefore, in consideration of the totality of circumstances, the court concludes that the government has met its burden of showing by a preponderance of the evidence that defendant voluntarily chose to give a statement and to consent to a search of his cell phone.

### Defendant's Second Argument:

**In Talib's case, he signed the Miranda waiver involuntarily, in the midst of a panic and anxiety attack. His only intent was 'to do anything needed to get out of that Interrogation Room.' As seen in Butler, supra, the Government's burden to show valid knowing and intelligent waiver has not been met.**

(Dkt. No. 42, Def.'s Br. at 16.)

A Miranda waiver is valid if it was "made voluntarily, knowingly, and intelligently." Moran v. Burbine, 475 U.S. 412, 421 (1986). Thus, the determination is a two-step inquiry:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

United States v. Vallar, 635 F.3d 271, 284 (7th Cir. 2011) (quoting Burbine, 475 U.S. at 421). "There is obviously no reason to require more in the way of a 'voluntariness' inquiry in the Miranda waiver context than in the [due process] confession context." Colorado v. Connelly, 479 U.S. 157, 169-70 (1986).

With respect to the second step, defendant does not now argue that he was not fully aware of the nature of his Miranda rights or the consequences of abandoning those rights. This stands to reason as the evidence shows that defendant was advised of his Miranda rights in this case, had been so advised "a lot" prior to May 6, 2015, and he specifically testified that he understood his rights and that he waived those rights. Instead, defendant attacks the first step of the inquiry arguing that his Miranda waiver was involuntary for the same reasons that he argued his statement and consent were involuntary. For the reasons stated above, these arguments fail.

As for defendant's attempt to analogize this case to North Carolina v. Butler, the central holding of that case is that a Miranda waiver need not necessarily be explicit, but the Court also made clear that "the question of waiver must be determined on the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." 441 U.S. 369, 374-75 (1979). Defendant does not explain how this case is like Butler or why the above

8

quoted standard has not been met in this case. Again, this results in waiver of the argument. See Wescott, 576 F.3d at 356.

Waiver aside, as discussed above, defendant has conceded that he was informed of his Miranda rights, that he understood them, and knew that he was waiving his rights. These circumstances, together with the lack of false promises and all the other factors discussed in the previous section of this order, leads this court to conclude that the totality of the circumstances shows that defendant's Miranda waiver was made voluntarily, knowingly, and intelligently because he had "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." See Burbine, 475 U.S. at 421; see also Ruvalcaba v. Chandler, 416 F.3d 555, 562 (7th Cir. 2005) ("In evaluating whether a suspect voluntarily waived his Miranda rights, we consider the same factors that we considered above in assessing the overall voluntariness of a confession."). Thus, the government has satisfied its burden of showing that defendant's Miranda waiver was voluntary, knowing, and intelligent.

### Defendant's Third Argument:

**Here, Talib's Consent to Search Cellular Telephone came only after invalid promises of leniency and/or threats by Government Agents attempting to elicit an incriminating confession from Talib. The stop and the questioning of Talib were all invalid as procured by Police conduct in violation of Talib's Constitutional Rights as guaranteed by the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution. As such, the statement and the search of the cellular telephone are fruits of the poisonous tree and should be excluded from evidence.**

(Dkt. No. 42, Def.'s Br. at 17.)

As the court reads this argument, defendant is contending that his inculpatory statements and his consent to a search of his cell phone were the product of prior illegality. The court has already concluded that defendant made a knowing, intelligent, and voluntary waiver of his Miranda rights as well as a voluntary statement. Consequently, defendant's consent to a search of his cell phone was not the poisonous fruit of an involuntary Miranda waiver or statement.

Defendant's assertion that the traffic stop and his arrest were constitutionally infirm is completely unsupported as defendant offers no analysis explaining why he believes the stop and arrest were unconstitutional. Consequently, this argument is waived. Wescott, 576 F.3d at 356. Even if not waived, the argument is without merit because the facts known to the officers at the time Agent King decided to stop the pickup and arrest defendant and his brother were more than sufficient to provide them with probable cause.

"An officer has probable cause for an arrest when at the time of the arrest the facts and circumstances within the knowledge of the officer and of which he had reasonably trustworthy information were sufficient to warrant a prudent man of reasonable caution in believing that the arrestee had committed or was committing an offense." Howlett v. Hack, 794 F.3d 721, 726-27 (7th Cir. 2015) (alterations and quotation marks omitted). The government bears the burden of proving that a seizure was reasonable. See W.R. LaFave, et al., 6 Search & Seizure § 11.2(b) (5th ed.) ([I]n

the federal courts: if the search or seizure was . . . without a warrant the burden of proof is on the prosecution); see also United States v. Uribe, 709 F.3d 646, 650 (7th Cir. 2013) (stating that the government bears the burden of establishing the reasonableness of a traffic stop by a preponderance of the evidence).

Prior to the traffic stop and arrests, the law enforcement agents knew that the CI had purchased cocaine from Tierre on three occasions and they had intercepted cell phone conversations indicating that Perez was Tierre's cocaine supplier. In addition, the CI told agents that defendant had recently been released from prison and was heavily involved in narcotics trafficking with Tierre. Agents also listened to Tierre and defendant discuss selling cocaine and observed defendant participate in a hand-to-hand cocaine transaction set up by Tierre. On May 5, 2014, defendant and Tierre discussed the prospect of obtaining cocaine from Perez and defendant remarked that he had customers waiting. On May 6, 2014, agents listened to conversations between Tierre and Perez contemplating the purchase of 7.5 ounces of cocaine. Thereafter, agents observed Tierre and defendant in the green pickup rendevous with Perez in his Cadillac. Agents then observed Tierre get into Perez' Cadillac for a short period of time before returning to the pickup truck which was then driven away by defendant. After stopping the pickup, agents discovered 7.5 ounces of cocaine on Tierre's person. The foregoing facts are more than sufficient to warrant a prudent man of reasonable caution in believing that both defendant and Tierre had committed and were committing the offense of conspiring to possess cocaine with intent to distribute.[2] Consequently, the government has met its burden of establishing the reasonableness of the seizures in this case. Therefore, because there was probable cause to stop and arrest defendant, his subsequent statement and consent to a search of his cell phone were not the poisonous fruit of an unconstitutional seizure.

### III. CONCLUSION

For the foregoing reasons, defendant's motion to quash arrest and to suppress statements and his motion to suppress physical evidence are denied.

Date: 9/30/2015

ENTER:

_____

FREDERICK J. KAPALA

District Judge

---

[2]The court notes further that the evidence shows that the agents observed defendant driving the pickup truck at a time when they knew that his driver's license was suspended. This gave the agents additional probable cause to the stop the pickup and arrest defendant. See 625 ILCS 5/6-303(a).